IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

TONI WEIGEL                                                                                    PLAINTIFF

        v.                        Civil No. 5:20-cv-05186-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                                   DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Toni Weigel ("Weigel"), brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 1382. In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g).

## I.    Procedural Background

Weigel filed her application for supplemental security income on October 26, 2017, alleging disability beginning July 1, 2014, due to bilateral hip osteoarthritis, lower back problems, bipolar disorder, post-traumatic stress disorder, anxiety, depression, chronic obstructive pulmonary disease, and obsessive-compulsive disorder. (ECF No. 11-2, p. 16; ECF No. 11-5, p. 2; ECF No. 11-6, p. 2). She was 42 years old on the date her application was filed, had a limited

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

education, and was unable to perform past relevant work. (ECF No. 11-2, pp. 28). The Commissioner denied her application initially on March 20, 2018, and upon reconsideration on September 27, 2018. (ECF No. 11-4, pp. 3, 14). At the Plaintiff's request, an Administrative Law Judge ("ALJ"), Hon. Glenn A. Neel, held an administrative hearing on August 12, 2019. (ECF No. 11-2, pp. 41-76). Weigel was present and represented by counsel. *Id*., p. 41.

On May 29, 2020, the ALJ concluded that Weigel's impairments of osteoarthritis/degenerative disc disease of the lumbar spine status post-surgery, osteoarthritis, rheumatoid arthritis, restless leg syndrome, obesity, hypertension, chronic pain syndrome, and history of bilateral total hip arthroplasties were severe, but concluded they did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (ECF No. 11-2, pp. 19-20). He then found Plaintiff capable of performing sedentary work, except that she can perform no climbing; she can only occasionally balance and stoop; she can perform no kneeling, crouching, or crawling; and she must avoid concentrated exposure to temperature extremes, humidity, and hazards, including no driving as part of work. *Id*., pp. 20-28. With the assistance of a vocational expert ("VE"), the ALJ found the Plaintiff could perform work as a document preparer, printed circuit board inspector, and a copy examiner. *Id*., pp. 28-29.

The Appeals Council denied Weigel's request for review on August 21, 2020. (ECF No. 11-2, pp. 2-7). She then filed this action. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs (ECF Nos. 16, 18), and the case is now ready for decision.

## II.   Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial

evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A claimant must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past

relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. § 416.920(a)(4). The fact finder only considers a claimant's age, education, and work experience in the light of her residual functional capacity if the final stage of the analysis is reached. 20 C.F.R. § 416.920(a)(4)(v).

### III. Discussion

Weigel raises three issues on appeal: (1) whether substantial evidence supports the ALJ's determination that she did not meet or medically equal a musculoskeletal listing; (2) whether the ALJ properly considered her obesity impairment in the determination of RFC; and (3) whether the ALJ properly considered the opinion evidence. After thoroughly reviewing the record, we find that substantial evidence does not support the ALJ's RFC finding. Because this necessitates reversal and remand, it is not necessary for the undersigned to address the Plaintiff's remaining arguments.

RFC is the most a person can still do despite that person's limitations. 20 C.F.R. § 416.945. A disability claimant has the burden of establishing her RFC. *Vossen*, 612 F. 3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses

the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

The opinion of a non-examining physician, standing alone, does not constitute substantial evidence in the record in the face of a conflicting assessment of a treating physician. *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999). An ALJ may conduct an independent review of the medical evidence and other evidence, such as motivation to return to work and daily activities, along with the non-examining physician's opinion. *Krogmeier v. Barnhart,* 294 F.3d 1019, 1024 (8th Cir. 2002). However, an ALJ must not substitute his opinions for those of a physician. *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008). An ALJ is not permitted to "play doctor." *Pates-Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir. 2009).

While an "ALJ may consider all evidence of record, including medical records and opinions dated prior to the alleged onset date, when there is no evidence of deterioration or progression of symptoms," it is improper for an ALJ to rely on an opinion rendered, which given its timing, could not consider the subsequent medical records indicating a worsening of [a claimant's] symptoms and functionality. *LaFrance v. Astrue*, No. 09-403, 2010 WL 624202, at *14 (D. Minn. Feb. 22, 2010) (citing *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010) (opinions of non-examining sources are generally entitled to less weight than examining sources, especially when those opinions do not account for all the pertinent evidence in the record). An ALJ errs in relying on his own inferences as to the relevance of notations in the medical record when determining a claimant's ability to function in the workplace. *See Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017) (remanding for further inquiry as to the relevance of "no acute distress" and "normal movement of all extremities" with respect to the plaintiff's ability to function in the workplace).

The evidence before the Court does not support the ALJ's RFC determination because the ALJ determined Weigel's RFC without a medical opinion to support his assessment of a large part of the treatment record showing a worsening condition. In setting out Weigel's RFC, the ALJ relied on the March 2018 and August 2018 assessments provided by non-examining state agency medical consultants. (ECF 11-2, pp. 20-28). State agency physician Robert Redd, M.D., initially reviewed medical evidence from January 2017 to October 2017 and assessed Weigel with a sedentary RFC with postural limitations. (ECF No. 11-3, pp. 37-41). Several months later, non-examining state agency physician Ronald Crow, D.O., reviewed the initial medical evidence as well as additional evidence from March 2018 to May 2018. *Id.*, pp. 54-57. Dr. Crow also assessed Weigel as having a sedentary RFC with postural limitations and projected his assessment to be applicable until March 2019. *Id.*, p. 57. The ALJ found the state agency consultants' physical RFC assessments to be persuasive, noting that they were consistent with and supported by objective findings in the medical evidence of record. (ECF No. 11-2, p. 27). The record does not contain additional physical consultative examinations or medical source statements. While the agency consultants reviewed medical evidence from January 2017 to May 2018, a large part of the medical record occurs outside of the state agency consultants' scope of review, including records indicating a worsening condition.

In August 2018, Dr. Scott Fedosky's examination of Weigel revealed that she was overweight and exhibited abnormal tenderness to palpation along the paraspinal muscles and spine. (ECF No. 11-9, p. 111). Weigel explained that she wanted help with weight loss and that she tried to exercise but experienced increased pain. *Id.*, p. 110. Dr. Fedosky prescribed phendimetrazine tartrate.[2] *Id.*, p. 112.

---

[2] Phendimetrazine tartrate is used for weight loss by making the brain less interested in food. *See* Weight-loss medicines, at https://medlineplus.gov/ency/patientinstructions/000346.htm (last accessed January 27, 2022).

6

Weigel also saw Michael G. Maline, D.O., in August 2018. (ECF No. 11-11, p. 7). She complained of hip pain with walking and knee pain with swelling and instability. *Id.*, p. 8. She explained that she fell while trying to break a large branch by stepping on it. *Id.* Upon examination, Dr. Maline observed that Weigel had an antalgic gait though she did not need an assistive device to walk. *Id.*, p. 9. She exhibited swelling of the knee with tenderness of the lateral patellar facet, the medial patellar facet, the medial joint line, and the lateral joint line. Her hips exhibited tenderness of the great trochanter despite a normal range of motion and strength on the left. *Id.* X-rays revealed a total hip arthroplasty in good position without evidence of fracture or loosening of the left hip and a well-maintained joint space without evidence of fracture in the left knee. *Id.* Dr. Maline found the imaging studies to be unremarkable and believed Weigel had a contusion from her fall. *Id.* He prescribed a Medrol Dosepak[3] and recommended a home exercise stretching program for IT band and hip bursitis. *Id.*

Later in August 2018, Weigel continued treatment with Mary F. Daut, M.D., for lower back pain, bilateral hip pain, and bilateral knee pain. (ECF No. 11-9, pp. 11). Weigel reported that her medication regimen did not alleviate the pain she experienced now that she had returned to work involving increased bending and lifting. *Id.* She reported pain at 7/10 with medication and inability to lie on her hip without severe pain. *Id.* While the recently increased Morphine dosage was helping, it had become ineffective since her recent attempt to return to work. *Id.* Upon examination, Weigel demonstrated joint crepitations with pain on motion of bilateral hips and knees. *Id.*, p. 14. While she demonstrated normal lower extremity strength and the ability to stand without difficulty, she exhibited an antalgic gait. *Id.* Dr. Daut advised Weigel to modify her activity level rather than increase her medication. *Id.*, p. 15. As oral steroids had not treated

---

[3] Medrol is used to treat inflammation. *See* Methylprednisolone, at https://medlineplus.gov/druginfo/meds/a682795.html (last accessed January 27, 2022).

Weigel's trochanteric bursitis, Dr. Daut advised Weigel to see her orthopedic doctor for an injection. *Id.*

In November 2018, Weigel continued treatment with Dr. Daut and explained that her pain had worsened since attempting to work in a manual labor job. (ECF No. 11-9, p. 29). She explained that she took more pills than prescribed because she experienced incomplete pain relief for just four hours. *Id.* She reported attending physical therapy, which she believed was helping her with strength, but she still experienced falls and pain. *Id.* The examination was essentially unchanged from her previous visit, but Dr. Daut noted that the nature of the physical demands of her job might not be reasonable with her physical issues. *Id.*, p. 33. Dr. Daut noted that Weigel had not done well despite undergoing two hip replacement surgeries, and she referred Weigel for a second opinion regarding the placement of her hardware. *Id.* Dr. Daut increased Weigel's dosage of oxycodone to allow more frequent dosing during work. *Id.*

In January 2019, Weigel continued treatment with Dr. Fedosky. (ECF No. 11-9, p. 100). Weigel reported loss of strength in her hips and sought a physical therapy referral for hip issues. *Id.* While she reported that she felt generally well, the exam confirmed hip pain with range of motion and tenderness to palpation. *Id.*, p. 101-102. Dr. Fedosky assessed Weigel for obesity, hypertension, depression, anxiety, hip pain, and status post bilateral total hip replacement. *Id.*, p. 102. Weigel was referred for physical therapy and advised to continue medications as prescribed. *Id.*, p. 103.

Also in January 2019, Weigel continued treatment with Dr. Daut. (ECF No. 11-9, p. 39). She reported pain at 6/10 with medication, that she was pleased with her current medications, and that she was still attending physical therapy. *Id.* Weigel explained that she was working full-time as a caregiver for an elderly person, and that she was taking Xanax, bupropion, and diclofenac

sodium.[4] Dr. Daut advised Weigel not to take Xanax due to potential serious interactions with her other prescriptions. *Id.* The physical exam was essentially unchanged since the prior visit, and Dr. Daut noted that Weigel had functionally improved now that she was taking the maximum opioid prescribing amount. *Id.*, p. 43. Dr. Daut explained, however, that she would not be able to increase Weigel's medications even if she were to have a flare-up. *Id.* Weigel would be referred to orthopedics for a second opinion regarding her hardware and possible surgical options. *Id.*

In April 2019, Weigel continued treatment with Dr. Daut and reported increased back pain with new radiation down the back of her leg to her foot. (ECF No. 11-9, p. 47). Weigel explained that she was working two jobs, including a landscaping job that required bending and lifting. *Id.* She reported new issues with a change of insurance and trouble getting medications. *Id.* She also reported adverse side effects from medications prescribed by her primary doctor. *Id.* Dr. Daut ordered a lumbar MRI to evaluate the new radicular pain and adjusted Weigel's medications to work around insurance restrictions. *Id.*, p. 51. She advised that a landscaping job requiring bending and lifting would not likely be an option in the foreseeable future with Weigel's back issues. *Id.* Weigel was referred out for pain injections. *Id.*

Also in April, Dr. Fedosky continued treatment of Weigel and noted abnormal lumbar and lumbosacral spine tenderness to palpation along the spine and paraspinal muscles. (ECF No. 11-9, p. 80). He prescribed gabapentin,[5] prednisone,[6] bupropion, and alprazolam. *Id.*, p. 81.

---

[4] Xanax is used to treat anxiety. *See* Alprazolam, at https://medlineplus.gov/druginfo/meds/a684001.html (last accessed January 27, 2022). Bupropion is used to treat depression. *See* Bupropion, at https://medlineplus.gov/druginfo/meds/a695033.html (last accessed January 27, 2022). Diclofenac sodium is used to treat pain and swelling. *See* Diclofenac sodium overdose, at https://medlineplus.gov/ency/article/002630.htm (last accessed January 27, 2022).

[5] Gabapentin is sometimes used to relieve pain. *See* Gabapentin, at https://medlineplus.gov/druginfo/meds/a694007.html (last accessed January 27, 2022).

[6] Prednisone is used to treat symptoms of low corticosteroid levels. *See* Prednisone, at https://medlineplus.gov/druginfo/meds/a601102.html (last accessed January 27, 2022).

In May 2019, Weigel's lumbar spine MRI revealed mild degenerative change involving the lumbar spine with broad-based central subligamentous disc protrusion at L5-S1 level. (ECF No. 11-9, p. 53). Dr. Daut reviewed the MRI and noted that Weigel's symptoms corresponded with L5-S1 radiculopathy. *Id.*, p. 55. Weigel complained of increased pain at 9/10 even with medication, continued radicular pain, and only minimal relief and little improvement from the current medication regimen. *Id.* The physical exam showed joint crepitations present with pain on motion of bilateral hips and knees. *Id.*, p. 58. While strength of the lower extremities was normal, Weigel continued to exhibit an antalgic gait. *Id.* Weigel explained that she was still attempting to work full-time. *Id.*, p. 55. Dr. Daut adjusted Weigel's nerve pain medication and referred her to neurosurgery for evaluation. *Id.*, p. 59.

Also in May 2019, Weigel sought emergency care for low back pain shooting down her leg. (ECF No. 11-10, p. 27). An exam showed limited mobility secondary to pain with movement and ambulation. *Id.*, p. 28. She was given a dose of pain medication in the emergency department for pain relief and discharged home to continue with normal daily medications. *Id.* Weigel also saw Candace Harper, P.A. at a spine clinic for evaluation of herniated lumbar disc. (ECF No. 11-9, p. 73). The exam showed tenderness at level L4-5 right paraspinal and right sciatic notch. *Id.* Flexion and extension were restricted and painful. Straight leg raise and Valsalva tests were positive. *Id.* She continued to exhibit an antalgic gait on the right, but her strength was normal in both lower extremities. *Id.* Weigel was assessed with lumbar herniated disc and lumbar radiculopathy, right. *Id.* The treating P.A. noted that Weigel's chronic low back pain had not responded to rest, NSAIDs, or opioid medications. *Id.* The lumbar MRI showed L5-S1 DDD with disc protrusion abutting the bilateral S1 nerve roots. *Id.* Weigel expressed eagerness to return to work, and the treating P.A. planned a review for surgical consideration. *Id.*

In June 2019, Weigel underwent a lumbar spine CT myelogram ordered by Candace Harper, P.A. (ECF No. 11-10, p. 86). The imaging revealed a left posterior central and paracentral disk protrusion at L5-S1 with impingement upon the transiting left S1 nerve root. *Id.* It also showed mild bilateral L5-S1 foraminal stenosis. *Id.* Weigel later visited the emergency department again with complaints of low back pain that radiated down her leg. *Id.*, p. 130. An exam showed tenderness to palpation at the lumbar spine and the right side of the lumbar spine in the right buttocks. *Id.*, p. 131. She was assessed for chronic back pain, sciatica, and back muscle spasm. *Id.*, p. 132. Weigel was given valium and Dilaudid[7] in the emergency department and discharged home. *Id.*

In July 2019, Weigel sought treatment from Dr. Maline for an upper leg and thigh problem. (ECF No. 11-11, p. 2). Weigel reported tingling and radiating pain in the posterior and groin area that radiated down her leg. *Id.*, p. 3. She explained that the pain in that area had started approximately four months ago and had gradually become excruciating such that she could not sit. *Id.* Upon examination, Dr. Maline observed that Weigel walked with a limp and antalgic gait. *Id.* She exhibited tenderness of the paraspinal on the right at L5 and the sacrum, and the seated straight leg raising test was positive. *Id.*, p. 4. There was tenderness of the PSIS, the SI joint, the greater trochanter, biceps femoris muscle, the semimembranosus muscle, the semitendinosus muscle, and the piriformis. *Id.* Weigel exhibited 3/5 flexion strength and 3/5 abduction strength on the right. *Id.* Dr. Maline concluded that Weigel's pain was nerve related and encouraged her to continue with her EMG scheduling and treatment with her pain management physician. *Id.*

---

[7] Dilaudid is used to treat severe pain in people who are expected to need pain medication around the clock for a long time and who cannot be treated with other medications. *See* Hydromorphone, at https://medlineplus.gov/druginfo/meds/a682013.html (last accessed January 27, 2022).

In August 2019, Weigel was referred for testing with Miles Johnson, M.D., for complaints of low back pain that radiated into the right lower extremity. (ECF No. 11-12, pp. 135). Dr. Johnson noted Weigel's history of bilateral total hip arthroplasties followed by continued severe pain in the low back and posterolateral right lower extremity. *Id.* An exam revealed difficulty with right knee extension, an inability to grade strength secondary to pain, decreased sensation in the right foot and leg, a positive straight leg raise in the right at 45 degrees, and an antalgic gait. *Id.* Dr. Johnson performed electrodiagnostic testing to evaluate peripheral nerve involvement and assessed Weigel with right S1 radiculopathy. *Id.*, p. 36.

Weigel also sought emergency care for low back pain on two occasions, one day apart, in August 2019. (ECF No. 11-12, p. 16, 83). She received medication for the pain, and lumbar MRI scans taken at both visits revealed posterior disc bulge at L5-S1 with encroachment of right S1 nerve roots. *Id.*, pp. 104, 107.

Later in August 2019, Weigel was treated for lumbar pain by neurosurgeon Larry Armstrong, D.O. (ECF No. 11-12, p. 144). The exam showed that she was in severe distress due to right leg pain. *Id.*, p. 145. She demonstrated restricted and painful lumbar and sacral spine flexion, extension, bilateral flexion, and bilateral rotation. All maneuvers radiated to her right gluteal region into the right lower leg, and she exhibited positive slump, straight leg raise, Thomas, and Valsalva tests. *Id.* While no muscle atrophy was noted, Weigel had an antalgic gait with limping and weakness of the right lower extremity. *Id.* Dr. Armstrong assessed Weigel with lumbar herniated disc, lumbar radiculopathy on the right, herniated nucleus pulposus, right leg weakness, and neural foraminal stenosis of the lumbar spine. *Id.* He planned to schedule Weigel for a lumbar microdiscectomy due to neural foraminal stenosis of the lumbar spine. *Id.* Weigel

underwent a right L5-S1 lumbar micro-laminectomy, medial facetectomy, lateral recess and nerve decompression, foraminotomy, and excision of HNP on August 27, 2019. (ECF No. 11-14, p. 8).

In January 2020, Weigel returned to Dr. Armstrong with complaints of right foot numbness, right buttock and calf pain after several falls, and the return of S1 radiculopathy. (ECF No. 11-15, p. 91). The exam revealed tenderness to the left sciatic notch, restricted and painful flexion and extension, a positive straight leg raise test, and an antalgic gait. *Id.*, p. 92. While Dr. Armstrong observed normal muscle tone and normal muscle strength in both lower extremities, he recommended repeat imaging as he suspected recurrent disc herniation. *Id.*

Objective medical evidence demonstrates continued treatment from May 2018 to January 2020, including imaging studies of S1 nerve root impingement and S1 radiculopathy and an operative report for lumbar surgery. (ECF No. 11-10, pp. 86, 104; ECF No. 11-12, p. 135; ECF No. 11-14, p. 8). Notably, the medical evidence recounted here was not reviewed by the non-examining state agency physicians in support of their assessments of Weigel's ability to function in the workplace. Moreover, there are no consultative exams or medical source statements assessing Weigel's physical ability to function in the workplace based on interpretation of these medical records. While the ALJ considered consultative exams completed in May 2015 and January 2018, both opinions only addressed Weigel's mental impairments and symptoms thereof. (ECF No. 11-2, p. 27).

Despite the state agency physician's assessment that Weigel could perform sedentary work with postural limitations until March 2019, the record shows that Weigel displayed worsening symptoms throughout the relevant period culminating in lumbar surgery in August 2019. The record does not include opinions from treating physicians or consultative examiners assessing Weigel's functional capacity in work settings during the period outside of the state agency

physicians' scope of review, which included imaging studies of nerve root impingement and an operative report of lumbar surgery. Without any such opinions, the ALJ could only rely on his own inferences as to Weigel's limitations in a work setting given these medical findings.

The Commissioner points to several instances in which Weigel reported to her treatment providers that she was attempting to work full time. However, "[t]he Commissioner's decision must take into account evidence indicating that the claimant's true functional ability may be substantially less that the claimant asserts or wishes. In selecting employees, employers are concerned with substantial capacity, psychological stability, and steady attendance; they will not unduly risk increasing their health and liability insurance costs by hiring a person with serious physical or mental problems." *Hutsell v. Massanari*, 259 F.3d 707, 713 (8th Cir. 2001) (internal quotation and citation omitted). While Weigel certainly made several statements regarding attempts to work full-time, each of these short-lived attempts were in manual labor type jobs and resulted in worsening symptoms. Weigel's treating provider, Dr. Mary Daut, noted that the nature of the physical demands of Weigel's continued attempts to work might not be reasonable with her ongoing physical issues. (ECF No. 11-9, p. 33). As no other medical opinion evaluated Weigel's ability to function in the workplace, the ALJ determined Weigel's RFC without a medical opinion to support his assessment over a large part of the treatment record showing a worsening condition.

By failing to obtain a consultative examination, the ALJ had to rely solely on his inferences about notations in Weigel's medical records and their relevance to her ability to function in the workplace. To support his RFC finding, the ALJ pointed to treatment notes between March 2018 and January 2020 in which Weigel ambulated without an assistive aid, climbed stairs, and attended physical therapy. (ECF No. 11-2, p. 26). The ALJ referred to treatment notes in which Weigel reported several attempts to work, often manual labor type jobs, and one occasion of traveling to

14

Washington to attend a funeral. *Id.* The ALJ noted Weigel's reports of constant, severe pain that was not controlled by medication, especially during her attempts to return to work. *Id.* The ALJ noted imaging results showing right S1 radiculopathy and nerve root impingement. Finally, the ALJ considered Weigel's operative report for lumbar surgery in August 2019 and noted that she did not return for a follow up until January 2020 when the treating physician suspected a recurrent disk herniation. *Id.* Because RFC is a medical question, the ALJ was not permitted to rely on his own interpretation of these treatment notes to arrive at Weigel's RFC. As such, the record does not provide substantial evidence to support the ALJ's RFC finding.

Accordingly, the ALJ's decision is not supported by substantial evidence, and the case must be reversed and remanded. We also find that a physical consultative examination is necessary to determine the true restrictions imposed by Plaintiff's impairments.

On remand, the ALJ should be directed to obtain RFC assessments from the Plaintiff's treating physicians, allowing the treating physicians the opportunity to provide an explanation for the limitations assigned should the ALJ have questions. If those physicians are unwilling or otherwise unable to complete the RFC assessments, then the ALJ should be directed to order a consultative examination, complete with a detailed RFC assessment of the Plaintiff's limitations. The ALJ should then reassess the Plaintiff's RFC, considering all her impairments, and conduct a thorough step four and, if necessary, step five analysis.

## V.   Conclusion

Based on the foregoing analysis, it is recommended that this case be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely**

**objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of January 2022.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE